# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANKIE ENRIQUEZ,<br><br>                    Petitioner,<br><br>        v.<br><br>J.D. HARTLEY, Warden,<br><br>                    Respondent.<br>_____/ | 1:09-cv-02005-AWI-DLB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following his 1989 conviction for second degree murder.  Petitioner is serving a sentence of seventeen years to life.

In the instant petition, Petitioner does not challenge the validity of the state court conviction; rather, he challenges the Board of Parole Hearings' (hereinafter Board) April 30, 2008, decision finding him unsuitable for release on parole.

In 2008, Petitioner filed a state petition for writ of habeas corpus in the Kern County Superior Court.  (Answer, Exhibit 1.)  In a reasoned decision, the superior court denied the petition finding some evidence supported the Board's decision that Petitioner presented a threat to public safety.  (Answer, Exhibit 2.)

1    Petitioner then filed a petition in the California Court of Appeal, which was summarily

2    denied.  (Answer, Exhibits 3 & 4.)

3    Petitioner also filed a petition in the California Supreme Court, which was summarily

4    denied.  (Exhibits 5 & 6.)

5    Petitioner filed the instant federal petition for writ of habeas November 16, 2009.  (Court

6    Doc. 1.)  Respondent filed an answer to the petition on February 1, 2010, and Petitioner filed a

7    traverse on February 25, 2010.  (Court Docs. 12, 13.)

8                                    STATEMENT OF FACTS

9    On November 7, 1987, police found the body of Russell Allen Clark, Jr., located in the

10   north alley of the 2100 block of Second Street, in Bakersfield, California.  Mr. Clark was lying

11   on his back and had a near-contact gunshot wound to the left rear side of his neck.  On August 1,

12   1988, an article appeared in the Bakersfield Californian detailing the unsolved murder of Clark.

13   Police received information from Andy Gonzales, indicating that Petitioner was responsible for

14   the murder of Russell Clark.  Gonzales indicated that he received the information from his

15   estranged wife, Linda Gonzales-who had been living with Petitioner on the night of Clark's

16   murder.  Linda Gonzales told police that on the night of the murder, she and Petitioner were at a

17   bowling alley and Petitioner became intoxicated and she believed he had used cocaine.  The two

18   were involved in a heated argument and returned to their residence where they continued to

19   argue.  Petitioner had a small gun, and when Linda went to bed Petitioner left the residence

20   through the front door.  He returned shortly thereafter and informed Linda that he had just shot

21   somebody.

22   Linda agreed to make a pretext phone call to Petitioner.  She engaged Petitioner in a

23   recorded conversation and he admitted to shooting Russell Clark.  Petitioner was later arrested on

24   October 11, 1988.  When interviewed by police, Petitioner stated that on the night of the

25   shooting, he had left Linda's house.  He saw a person walking southbound down Gonzales'

26   driveway.  Petitioner said as soon as the person saw him he took off running.  Petitioner obtained

27   his gun, cocked it, and told the person to stop stating "I've got a gun."  Petitioner chased the

28   person because he believed he was a prowler and he wanted to apprehend him for police.

                                              2

Petitioner caught Clark and grabbed him with one hand and placed the gun to his head with the other.  Petitioner admitted that Clark did not resist or say anything to him.  Petitioner claims he became overwhelmed with anger, and attempted to strike Clark on the head with the gun when it fired shooting him in the head.

(Exhibit 1, to Answer, Transcript at 12-17 ("hereinafter Transcript").)

DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

4

1 │ states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

2 │ state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th

3 │ Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

4 │     AEDPA requires that we give considerable deference to state court decisions. The state

5 │ court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

6 │ interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,

7 │ 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

8 │     In this instance, the last reasoned state court decision of Kern County Superior Court

9 │ found, in pertinent part, "there is still evidence of a threat to public safety, releasing petitioner on

10 │ parole would run counter to the standards enunciated in Lawrence and Shaputis." Ylst v.

11 │ Nunnemaker, 501 U.S. 797, 804-805 (1991); see also Exhibit 2, to Answer.)

12 │ II.    Review of Petition

13 │     A parole release determination is not subject to all the due process protections of an

14 │ adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see

15 │ also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural

16 │ protections that particular situations demand). "[S]ince the setting of a minimum term is not part

17 │ of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not

18 │ constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at

19 │ 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole

20 │ board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive

21 │ advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an

22 │ "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the

23 │ inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the

24 │ Board must be supported by "some evidence" having an indicia of reliability. Superintendent,

25 │ Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th

26 │ Cir.1987).

27 │     "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not

28 │ comport with 'the minimum requirements of procedural due process,' unless the findings of the

prison disciplinary board are supported by some evidence in the record.'  472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128.  In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence.  Id.  Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board.  Id., *citing* Superintendent v. Hill, at 455-56.  Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term."  Id., *citing* Jancsek v. Oregon Bd. of Parole, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner was provided all that is required.  Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied.

The California Supreme Court clarified the standard of the review applicable to parole

decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008).  The applicable

standard "is whether some evidence supports the *decision* of the Board or the Governor that the

inmate constitutes a current threat to public safety, and not merely whether some evidence

confirms the existence of certain factual findings."  Id. at 1212 (emphasis in original and citations

omitted).  As to the circumstances of the commitment offense, the Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances
> of the commitment offense as a basis for a decision denying parole, the aggravated
> nature of the crime does not in and of itself provide some evidence of current
> dangerousness to the public unless the record also establishes that something in
> the prisoner's pre- or post-incarceration history, or his or her current demeanor
> and mental state, indicates that the implications regarding the prisoner's
> dangerousness that derive from his or her commission of the commitment offense
> remain probative to the statutory determination of a continuing threat to public
> safety.

Id. at 1214.[1]

At the 2008 hearing, the Board found Petitioner unsuitable for release based on the

circumstances of the commitment offense, lack of insight into the causative factors, and limited

programming and self-help therapy, including lack of understanding of his alcohol and substance

counseling.  (Transcript at 55-60.)

With regard to the commitment offense, the Board found it was carried out in a manner

which demonstrates an exceptionally callous disregard for human suffering.[2]  The Board also

---

[1]  To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification."  In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

[2]  Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

found Petitioner lacked sufficient insight into the causative factors of the offense.  Some

evidence supports the Board's findings.  The victim was killed by a gunshot wound to the neck.

Although Petitioner maintains it was an accident, he never summoned help for the victim or

attempted to assist the victim in any way after the shooting.  In fact, as the Board pointed out, the

record belied Petitioner's claim that the shooting was accidental.  Petitioner claimed that there

had been prior incidents of prowling around his residence.  On the night of the shooting,

Petitioner had been drinking heavily and consumed cocaine.  He saw the victim somewhere near

his home and apparently believed him to be a prowler, and chased the victim armed with his gun.

Petitioner admitted that he did not know if the person he was chasing was involved in the prior

prowling incidents. The victim immediately stopped when ordered to do so by Petitioner and did

not resist in any way when confronted by him.  Yet, Petitioner out of a rage of anger shot the

victim in cold blood, and went on with his daily routine until appended by police.

As pointed out in the psychological evaluation, Petitioner

> "appears to minimize his actions in the controlling offense.  The inmate noted that
> he placed some of the blame of the shooting on the victim.  It should be noted that
> the victim in the controlling offense did not struggle or fight against the inmate in
> any fashion.  The Probation Officer's Report indicates that the victim was
> compliant with the inmate, and was not either verbally or physically aggressing
> toward the inmate.  Additionally, the inmate noted to this examiner that the victim
> did not struggle with him in any form or fashion.  This examiner believes that the
> inmate should begin to claim full responsibility for his actions in the controlling
> offense, and not place any blame on the victim."

(See Exhibit 1, to Answer, Psychological Evaluation, at 10.)  At the hearing, Petitioner stated "I

think [the victim] had a little something to do with [the crime], but I was the one to blame to do

that, so, you know, taking the boy's life."  Transcript at 48.  Petitioner continued to state that he

felt the victim had been prowling, but he did not mean to kill him.  Id.  However, there is no

evidence in the record to support the finding that the victim was doing anything other than

walking down the street and alley that night.  Although at the hearing Petitioner maintained that

he saw the victim looking through the windows of his house-the Board pointed out this was a

new version of the victim's activities that was not previously presented.  Id. at 56.  Petitioner

himself admitted that the victim immediately stopped when he ordered him to do so and did not

resist.  Accordingly, Petitioner's claim that the shooting was an accident is simply not supported

by the record, and the Board was legitimately concerned about Petitioner's claim to the contrary.
Given that the Board did not find Petitioner's version of the commitment offense to be credible,
there was "some evidence" in the record to support its conclusion that Petitioner has not
developed sufficient insight underlying the reasoning behind the commitment offense and
remains unsuitable for release on parole.  Lawrence, 44 Cal.4th at 1228; In re Shaputis, 44
Cal.4th 1241, 1246 (2008) (circumstances of commitment offense and inmate's current attitude
toward his crime are, by statute, factors relevant to his suitability for parole).  In light of these
circumstances, this Court cannot conclude that the state court's denial of Petitioner's claim was
contrary to or an unreasonable application of Supreme Court precedent, and some evidence
supports the Board's finding that the commitment offense continues to remain predicative of
Petitioner's current dangerousness when viewed in light of the entire record.

The Board also found that Petitioner had participated in limited programming and self-
help therapy.  The Board was particularly troubled with the fact that Petitioner was able to
articulate only one of the twelve steps of the Alcoholics Anonymous (AA) Program-the necessity
to make amends with those to which he caused harm, despite several years of participation in the
program.  Given that alcohol and drugs played a pivotal role in the commitment offense, the
Board was reasonably concerned that Petitioner had not gained sufficient understanding of the
principles involved in AA to utilize in his everyday life if released.[3]  The Board recommended
that Petitioner engage in self-help therapy by reading books, taking college courses, and attempt
to gain a thorough understanding of the principles of AA. Transcript at 58-59.  Accordingly,
there is some evidence to support the Board's finding that Petitioner remains an unreasonable
risk to public safety.

Pursuant to section 2402(d), the Board also considered the factors in support of suitability
for release.  The Board commended Petitioner for not receiving a single rules violation during his
incarceration, adequate parole plans, exceptional job performance, and participation in AA/NA.
However, on balance, the Board found these positive factors did not outweigh the factors in

---

[3] At the hearing, Petitioner admitted that alcohol and drugs played a major rule in the commission of the
commitment offense.  (Transcript, at 24, 28.)

1    support of unsuitability.

2        Petitioner contends the Board has relied solely on the immutable circumstances of the

3    underlying offense and his criminal history prior to incarceration. In Biggs v. Terhune, 334 F.3d

4    910, 916-17 (9th Cir. 2003), the Ninth Circuit stated that "[a] continued reliance in the future on

5    an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

6    contrary to the rehabilitative goals espoused by the prison system and could result in a due

7    process violation." Although a denial of parole initially can be justified by relying on the gravity

8    of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and

9    evidence of rehabilitation, denying him a parole date simply because of the nature of [his]

10   offense and prior conduct would raise serious questions involving his liberty interest in parole."

11   Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), citing Biggs, 334 F.3d at 916.  Nevertheless, in

12   both Irons and Biggs, the Ninth Circuit upheld the denials of parole based solely on the

13   commitment offense.  Here, the Board based its decision on the circumstances of Petitioner's

14   offense, lack of underlying insight, and insufficient programming.  In addition, Petitioner has not

15   been denied parole forever; rather, the Board pointed out he would be considered again for parole

16   in one year.

17       In sum, this Court cannot conclude that the Board's denial of parole has resulted in a due

18   process violation when considering, in combination, the circumstances of the commitment

19   offense, lack of insight into the causative factors, and limited programming.  Accordingly, the

20   state courts' determination of this issue was not contrary to, or an unreasonable application of,

21   clearly established Supreme Court precedent.

22                                    RECOMMENDATION

23       Based on the foregoing, it is HEREBY RECOMMENDED that:

24   1.      The instant petition for writ of habeas corpus be DENIED; and

25   2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

26       This Findings and Recommendation is submitted to the assigned United States District

27   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

28   Local Rules of Practice for the United States District Court, Eastern District of California.

1   Within thirty (30) days after being served with a copy, any party may file written objections with

2   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

3   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

4   and filed within fourteen (14) after service of the objections.  The Court will then review the

5   Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

6   failure to file objections within the specified time may waive the right to appeal the District

7   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9        IT IS SO ORDERED.

10       **Dated:**   **April 13, 2010**              _____**/s/ Dennis L. Beck**_____
                                              UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28